This is N. Ray Black, 2018, 1166. Mr. Lucas. Good morning, Your Honors. James Lucas on behalf of Appellants Black and Hayes. May it please the Court. Appellants here are requesting this Court to reverse a decision by the Board finding Claim 1 obvious. As discussed in the briefs, we think it's readily transparent that the Board did not make out a prima facie case of obviousness. The Board addresses this multi-passage or multi-clause tag file limitation and specifically defines it as the tag file limitation, and then goes through the art, the prior art, and never addresses multiple limitations in that tag file limitation. Are you saying the Board misconstrued the tag file limitation? I mean, is this a claim of construction? No, we're not saying that, because the Board did define the word tag file. But what happens is, it's really more of a just disregarded the claim language that the Board determined, and I think both parties determined didn't require necessarily a construction, just ignored multiple clauses of the tag, of the claim, and I can kind of address some of those. So you're saying the multiple clauses do not collectively constitute a tag file? I thought that was the point. That's, well, should be clear, the Board did define the word tag file. The Board never defined tag file limitation, but addressed, I should say, did address the entire tag file limitation. It didn't do an actual claim construction of the tag file limitation. The point is, then, when it made this determination as to whether the prior art disclosed the elements of the claim, it just said it disclosed a tag file. It ignored the rest of the limitations of the tag file limitation. I think that's the point, and those are that the tag file has to be associated with a GUI-activatable link, for example. That the tag file has to be packaged together and include in a single file a definition of the controllable device and a listing of the commands. And then, also, if you go down further into the claim, once a request is made on the GUI and the activatable link, it has to actually execute this tag file. What's your argument? Where's the error here? The error is really that the Board failed to find that the prior art disclosed, taught or suggested, all the limitations of Claim 1 and, specifically, all the limitations of the tag file limitation. But your primary focus, though, is on the fact that the prior art doesn't disclose the definitions and commands in a single tag file, right? And it doesn't also, at the slave relay, and then also that you can't basically use a cell phone, hit the activatable link and execute that tag file. They never even discussed that. In fact, if you look at the original decision, which is Appendix 6 through 16, and I'll direct you to a specific point at Appendix 14. They go through R-Link and then they say, we find this passage of R-Link teaches a data structure that defines the command to be transmitted to a controlled device upon activation of a tag at a controlled device. That is strictly their definition of a tag file. They ignore all the other limitations of the tag file limitation that is specifically discussed at Appendix 10. They actually go through the two clauses. I understand this might be a matter of semantics, but you argue that they shouldn't have found that all the elements of the claim are in the prior art. But it seems like you're also saying because they misunderstood what all the elements of the claim are. Well, I think they just ignored them and just found, you're right, it's kind of blatant. They just found, yeah, the tag file is disclosed, but they forgot about the rest. I agree. It's almost so blatant. I agree with that. And then what happens is if you look at the rehearing decision, then the appellant says, look, you didn't find all of these limitations of the tag file limitation are disclosed in the prior art. You never even got there. You just said that the tag file goes through all those limitations. And then they said, well, the board says, kind of agrees. And then it says, well, it was implicit that we had, in our earlier opinion, we had done all that. But still doesn't address all of those other limitations in the rehearing decision. So, yes, I mean, I think the big issue is that the board failed to make out a prima facie case of obviousness because they failed to show that the prior art alone or in combination met, excuse me, disclosed, taught, or suggested all of the elements of Claim 1. That's clear. If there was a motivation to combine Nakajima, would that have been enough to fill the gap on those other limitations? No, I don't think so. They only use, at the end, in the rehearing decision, and actually I think the appeal decision, they only use Nakajima for direct transmission. Simply saying, originally the examiner actually said, you might have noticed this, that the commands are directly transmitted to the TV and the auxiliary devices. Then the board switched over and said, that doesn't make any sense. Because the remote control is not the slave relay. We have to make the slave relay the TV. The problem is Nakajima is completely different because Nakajima already has, is basically just allowing all of your appliances to use a visual guide on the TV. So you can, basically everything's already there because it was brought in by the controlled appliances to the TV. What's unique about this is, this basically, the invention of the Claim 1, it allows you to take your cell phone and say, I want to watch the Super Bowl. And then what happens is you activate that, say like the listing for the Super Bowl. And what happens is you have a complete tag file that has definitions of everything you need to see to find the right device. Say you have a Samsung TV, it has that in there. And it also has the commands to set the TV to the right channels in a complete executable file. So you can hit that and that's all stored on the slave relay. And then it allows you to tune right to the Super Bowl and the TV to tune right to the Super Bowl because you've hit it on the cell phone. It's very unique in that it's packaged and it's already, it's all packaged together in a single executable file. I think that's another thing, you never see the word executed in any of the board's decisions. And that's telling because that relates to the second clause of the tag file limitation. Where it specifically says executing the tag file where upon a communication protocol corresponding to the definition and also corresponding to the commands is directly sent. I do want to address a couple of the, so that's really the crux of it on the issue of obviousness. It's that really that the board just failed to find that multiple limitations were disclosed by the prior art. And it's a blatant failure. Now in the reconsideration order, do you think that the board does not do enough to explain where it finds the other limitations? I do. I do think that. Let me just pull that up for you. It's very short again and this is where they now add in a, what we call an inherency finding that they never brought up before. They say, what we meant to say implicit in that finding is that everything, you know, was in R-Link. Well the definition and the commands, the problem is that they now rely exclusively on R-Link it seems like for everything in the tag file limitation. Pretty much everything other than the direct. The direct, exactly. But still not enough. And it's not enough because it doesn't address the execution. And I think that really just addresses at most the first clause of the tag file limitation. But it doesn't address, and you can see it doesn't address the second clause of the tag file limitation, the in response clause. There's nothing about in response to receiving the request like we just talked about that you execute the tag file and then a communication protocol is sent and all that kind of stuff. None of that's discussed. They're just addressing the first clause at the very most. I can get into R-Link doesn't even disclose that because what R-Link does, but I don't even know if I need to unless you'd like to. R-Link doesn't even disclose that but I think that's more of a fact issue because what R-Link does is R-Link just takes state data. It has like a state server and all R-Link does is kind of looks at what the state is of certain appliances that are being controlled in different locations and then just reports back the state. Now the only way you would ever even, so that's state data alone. There's no command data and definition data packaged together with that state data. The only way you would ever even get into, there is the discussion of commands and command conversion. But the only way that happens is if you change locations and then you need the state server to have to try to recreate the state at the earlier location. It might not happen though because it might be that you have the same exact TV in two different rooms and a lot of other stuff. Regardless, that's not an executable situation. That's just basically much later on you might have to create commands and you might have to create the definitions of the devices. So it still doesn't even disclose that first clause and definitely doesn't even address the second clause of the tag file limitation. I think I will reserve unless there's further questions. We will do that. Thank you, Your Honors, and may it please the court. Our position is waiver that appellant made very limited arguments to the board. I respectfully invite the court's attention to page 188 of the record. And that's appellant's brief argument to the board. It only spans a few pages. And as the board quoted in its decision, it was addressing tag file and the two clauses after tag file. Definition of a controllable device and a set of commands. We know the board addressed that by the board's decision. What are you saying is waived? The issue of motivation to combine with respect to Nakajima or are you saying that it was waived, Your Honor? What was waived? That he targeted his arguments in his brief to the board at page 188 to 191. And they were just about a few limitations in the claim, the tag file not being present in the prior article. But the claim says what it says, right? So, I mean, as it relates to the claim, there's a lot of limitations in the claim. And the parties collectively refer to those as essentially the tag file limitation. And my problem is I just don't see how Arling teaches everything. And I certainly don't see where the board says that Arling teaches everything. So, what about that discussion was waived and where in Arling do you find? I mean, the board just says, well, it must have been in there. I don't even understand that on reconsideration. The board just sort of says, well, in order to do what it did, it probably had to have this. But it didn't point to anything in Arling to show us. So, are you saying that he waived his right to have the board actually find the elements of the claim in the prior art? In part, Your Honor, because on page 164 of the record, the examiner, over four pages, set forth a strong prima facie case largely founded on Niwa Moto, which shows the three block elements, a remote, a relay, and a controllable device such as a TV or DVR. And the examiner said, what's missing is just how you store the data to have a tag file as to the particular controllable device. Because Niwa Moto did it by way of a user ID and apparatus, and that's on page 165. But the board just relies on Arling. Because that's all that was argued to the board. What was argued to the board was that the tag file part of the claim, which includes the two-word phrase tag file and the definitions of the controllable device and the set of commands,  applicant, in its four-page argument section to the board, said that those three parts of the tag file part of the claim are not found in, as the examiner said, Arling or Nakajima. But the board, in its first decision, said, yes, tag file is found in Arling. And then it discussed Nakajima very thoroughly on page 15 of the record and said, the big parts of the claim as to tag file are in Nakajima. Then on rehearing, the board realized that for Arling, it did its job about halfway. And then it iterated how the examiner, and this is on page 199 of the record, the examiner almost quoted from Arling device definitions on page 199 of the record. And this is where the board, in its second decision, picked up on. This is an appeal going on here. There was a prosecution before the examiner with the examiner's findings. And the board used the examiner's findings. Where does the board state its analysis or its reasoning with respect to the motivation to combine Arling and Nakajima? Well, I have to say, Your Honor, that the examiner found the motivation as to Where does the board state the motivation? It doesn't, because it wasn't argued to the board specifically or generally. That's what the board found. It found there's a motivation to combine Arlington and Nakajima. Other than just saying that, it doesn't explain what the motivation was or say anything else. I'm sorry, Your Honor, I respectfully disagree. Because what was argued to the board, and this is all that was argued to the board, again, page 188 to 191, is that the two supplemental references, Arling and Nakajima, lack this tag file part to the claim. And this is what we're relying on to the board. Once the board found that the tag file part was present in two prior art references, and the examiner had found motivation, and that's on page 167 of the record, the examiner had expressly said, which was not contested by the applicant to the Board of Appeals, the examiner said that one would have been motivated to use the functionality of Arling because it provides an established system of accessing information, improving overall operability. That's on page 166. So, again, we have to present it this way because of what was argued specifically to the board, and the board addressed everything that was argued to it. As I said a little while ago, it took two decisions for the board to really show how Arling discloses the three parts of the tag file part, the command control, which comes from the specification that the board found, and the definition of controllable device and set of commands, and the board cleaned things up in its rehearing decision. But even in the rehearing request, which is on page 166. Well, I don't really understand. So tell me where in the rehearing decision you think the board really cleaned things up because all I see is, well, we don't have to say that Arling really shows the definitions and commands in a single tag file because it must have. I mean, it kind of says it inherently had to have. I don't understand that. Especially in an obvious misanalysis. Well, it says more than that, Your Honor. What it says, I'm on page 4 of the record, and starting near the top around line 5 on page 4, it said we did not disregard the other two limitations argued. And what it says here, it says this is where I was going with how it relies on the examiner's answer. The examiner quoted from Arling device definitions, and that's found on page 57 of the record in Arling paragraph 30. And so before the must store, which is around line 20 of this key page, this is page 3 of the board's rehearing decision, page 4 of the record, above that the board says a lot. The board says they agree with the examiner, and the board's allowed to do this, that the examiner worked hard and made explicit findings. Did the board establish or find obviousness on a different basis than the examiner? No, not at all, Your Honor. The examiner combined the three references in Nakajima, Buttress's, Arling. They both show the tag file part of the claim, and there was motivation in those two references that the examiner found to combine that with the primary reference in Iwamoto. And then applicant chose what to argue to the board for reverse order. But wasn't this inherent disclosure that the board talks about, that was something new that the board found? The examiner did not make that finding. The examiner actually did, Your Honor. It's above on this page, page 4 of the record. The board expressly ---- Well, I know the board did. I'm talking about the examiner. Well, but ---- The examiner did not make this inherent disclosure. No, the examiner made an express disclosure, and the board did it two ways on this page. And the board made an inherent disclosure in order to make it all work. I'm sorry, Your Honor. And then ---- That's not all of it. And then it seems to me, and this goes to the question I was asking before, there's no articulation of a motivation to combine on the basis of that inherent disclosure. But, Your Honor, I'd like to respectfully point the court to, on this page 4 of the record, in the top part, the board went to precisely the examiner's two pages, which made the findings I believe you're talking about, that the tag file part was disclosed in Arling. And so we see that on page 4, discussing Arling paragraph 30, the board went to the examiner's answer. It says, it is our agreement with the examiner that Arling's teaching of command conversion to address a particular controllable device ---- Well, I mean, so the board says, we didn't really ignore all these limitations. The examiner found that Arling and Nakashima taught them, and so we agreed. But that's it. In our agreement is that we found them. But it doesn't say how or where. And farther down in that page, which you cite to as the detailed fixing of things by the board, it says Arling must store both devices, definitions for the different devices as well as commands. But it doesn't say this is where Arling describes that or this is where Arling shows it. It just says it must do that inherently. I don't understand how that's an obvious misdetermination. It is, Your Honor, because just above that, the board just said that the examiner relied expressly on Arling, paragraph 30, for the challenged limitations. And this sentence a little ways down is like a conclusion that because Arling and respectfully inviting the Court's attention to Arling, paragraph 30, pages 57 and 58 of the record, Arling on page 57 in paragraph 30 says, as the examiner and the board piggybacked on the examiner's finding, on page 57, this is Arling in paragraph 30, line 12, Arling says right there, device conversion definitions. And that is what the examiner was relying on to meet the other. What line are you on in paragraph 30? On page 57. On line 10. Yes. Okay. This disclosure is written in paragraphs, so there's a paragraph 30 in column 2, paragraph 30 going 12 lines down from that. We have device conversion definitions. And that's what the examiner was relying on. The examiner actually quoted that on page 199. The examiner talks about device definitions, and earlier in the prosecution, the examiner talked about Arling showing device definitions. So that's what the examiner was relying on, and the board expressly referenced that in its second decision. It should have in its first decision, but in its first decision, it had Nakajima, which expressly discloses in its paragraph 51, a controllable device specifications to generate interfaces and target controllable devices. So all of the tag file part of the claim is also supported by the substantial evidence in Nakajima, and appellants of this court didn't contest that Nakajima finding, or at least I believe he hasn't. His primary focus was on the Arling analysis not being sufficient enough the first time through and the second time, in their view. But Nakajima shows that what you can do. Are you saying Nakajima shows anything other than the direct connection? Yes, Your Honor. As the board found on page 15 of the record in its first decision, Nakajima clearly, as the board was saying, Nakajima, and we know that by the board quoting what it was addressing before about Nakajima, it's on page 13, but Nakajima in this great block quote, this block quote has a lot of elements in it. It gets interface specifications from, this is in the middle of the block quote, auxiliary devices, and those are the controllable devices. So it's getting the uniqueness of each device to define and generate interfaces. And what we have here, a lot of us probably use universal remote controls as a remote, a relay in the middle, and then the relay is like a hub. It picks which device to go to. The board addressed the arguments made to it, and the examiner set forth a full Prima Fish case based on the evidence of record, which applicant then selected to the board. Let me refer you to the figure that your portion of Arling was referring to. It's the figure two. Yes, Your Honor. Now this shows the definitions and the commands in separate places, right? They are used, Your Honor, yes, as, and the examiner didn't expressly rely on this, or the paragraph 31, which discusses device definitions, just those two words as a feature, item 135 in there. That's from paragraph 30. So how is that in one tag file? How are those things in a single tag file? Well, Your Honor, I'm looking. Look at the difference between 135 and 132. 135 is definitions. You see that? Yes, Your Honor, and we tried to understand that part of appellant's brief, that how it would defeat the evidence actually relied on in paragraph 30, which says device definitions, and we don't think Arling is that narrow, that the figure two embodiment is all that Arling is good for, and we tried to address that in our brief. But that figure two is what that paragraph 30 cites to, and that's what the board cited to. So I don't understand why that's not descriptive of what it is we're supposed to be looking at. But it also says that what we have in paragraph 30, as I referenced before, line 12, device conversion definitions, and figures one and two are referenced in this paragraph. So what's going on here, and this relied on substantial evidence by the board and examiner, is that we've got device definitions and commands. It's very clear we have a lot of commands going on here. The question is that Arling uses, as has been challenged, device definitions, and how else would you isolate the device you wanted other than to have some type of tag within the command to get the command to go to that particular device? And this is what the board and examiner relied on. So, again, you're conceding that their entire analysis is that it must have been inherent in here. And you know that under our case law, the use of inherency in an obviousness analysis is an extremely limited concept. I'm sorry, Your Honor. This may take a few moments to do it, seconds. I'm not conceding because when the board said the must at the bottom, and we agree this could have been better worded. Above that, what the board was clearly relying on was what the examiner found, which I've referenced the court to, pages 199. It doesn't matter what the examiner found if when you go back to the original source, it's not there. So if the examiner, quote, found it, the examiner's not evidence. Well, it's in Nakajima even more so than in Arling. And the board found these tag file parts to the claim in both references, based on what was argued to the board. And I do submit that Nakajima is a clearer teaching in the concise block quote that the board used than Arling, which you do have to go across two pages and different figures. Nakajima hits the ball out of the park with having interfaces and specifications from the auxiliary or controllable devices, and that's a very strong position that this court. So where does Nakajima disclose the tag file with all the limitations? As the board, thank you, Your Honor, as the board found on page 15, the board was relying on Nakajima, paragraph 51, and we have commands and we have controllable devices, either 104 to 108, and we get, this is key, specifications from these auxiliary devices. And those specifications then generate interfaces, and we know that's an electronics way of communicating. So the specifications drive which auxiliary devices then, at the end, this is very key also, targeted. The relay targets particular controllable devices. So that's all that was needed for this broad claim, which just concerned one remote control and a controllable device at the end and a relay in the middle. And we submit that this claim could be maybe amended. You conceded in your red brief that Nakajima wasn't offered for anything other than the direct transmission, right? I mean, this is my problem. A, you didn't argue waiver in your red brief. B, you conceded in your red brief that Nakajima was not the be-all and end-all, that it was only offered for this limited purpose, and that you had to find the combination of Arling, which you said covered all the tag file limitations, and Nakajima, which gives the direct connection, and that's how you put the two together. So you're coming up with a totally different argument here. I'm sorry, Your Honor. I believe. Okay. Well, you're way out of time. I'm sorry. Thank you. Thank you, Mr. Piccolo. Mr. Lucas has some rebuttals. Thank you, Your Honor. I'll be brief. I think the record is very clear that the examiner and the board never found that the tag file limitation we've been discussing was disclosed by the prior art. There was no waiver. Those arguments were made by the appellant during the prosecution of the patent and also before this court, before the board specifically. They consistently addressed the two. That's what counts before the board, right? Excuse me? That's what counts before the board. Yes, correct. And they were. And, I mean, I can direct you to those if you'd like, but, I mean, it was very clear that in the appeal brief at 185 through 181, it's argued, you know, at 189, it's very clear that the appellant is arguing that the entire tag file limitation is not disclosed by the prior art, also done at 190. Does the board's citation to paragraph 30 of Arling fix all that? It does not. First of all, going back to the discussion about the examiner, excuse me, the board relying on the examiner, the examiner only found initially, and obviously in his final law section, that Arling disclosed the definition and the commands, and that, once again, at the very most, is that first clause of the tag file limitation. We still, there's still, it was never even discussed, there's never any discussion of this complete executable tag file that's executed in that second clause. That's not mentioned in any of the decisions of the examiner at 164 to 17. It's just, you know, there's a significant, you know, just no wording about whether the prior art, no finding about whether the prior art, the loaner in combination discloses the tag file limitation. All of the specific elements of the tag file limitation is never discussed. And then again, there's no motivation to combine ever discussed. And as pointed out, I mean, the grounds for rejection were changing by the board. They did add new bases, including an inherency fine, you know, an inherency fine that was discussed in the re-hearing decision. And I think the appellant's request, complete reversal because I think it's clear from the record that there's no, that this claim is not obvious and the board, you know, should not have found it obvious. I understand the board didn't talk about Nimamoto, but the examiner did. So what does Nimamoto add to the analysis? So Nimamoto was, I mean, primarily, if you look at 165, and there was a discussion that there was a discussion that Nimamoto might have talked about something in the tag file limitation. No. I mean, if anything at 165, the examiner is very clear that anything related to a tag file is not disclosed in Nimamoto. And that's why he goes on and talks about Arling. I think what you do have in Nimamoto at the beginning is the GUI on a personal communication device. You do have like, that's what the, the examiner was relying on for that, that you could use, for example, like a cell phone and there was a graphic display that that's really the big thing. There was a discussion. There was, there was just one other thing. There was a discussion about what Nakajima discloses. And obviously that, it seems that the position on that's changed, but, but, but in the, in the, in the appeal, excuse me, excuse me. And the original decision, not the block quote actually is talking about the I think, well, right before that it's talking about the board relied on Nakajima for a slave relay. But obviously that changed. And I, I agree that in the rehearing decision, it's, it's really that Nakajima is only disclosed for a direct transmission, but that's also incorrect. So unless the board, unless you have any other questions, I think. It's incorrect that Nakajima shows a direct transmission? Correct. No, I wouldn't say directory. It does. It just show that that their commands are being transmitted from the TV to the, from the TV, but that's different from, than a slave relay. But, but that, and there's also in isolation, there is a direct transmission. I agree with that in Nakajima, but that, that, that, that reads out the other issues of having an executable file that then. Right. So, I mean, you still have to have the executable file. I guess my question is, did you ever argue to the board that there was no motive assuming Erling showed all the tag limitations? Did you argue to the board that there was no motivation to combine that with Nakajima? I think we, I think we did because of what the differences in, in, in what Nakajima was doing. Let me, let me double check there. I'm looking at, I don't want to, I don't want to misstate, you know. I don't want you to either. Sorry. So I'm looking at the appeal brief at 190. We addressed Nakajima at 190 to 191, but I think it more has to do with you couldn't combine that with Erling because it doesn't disclose all the tag file type limitations. I don't think we address. It's just, you know, they're just display tags. They're not, they're showing what for example. So if we find all the tag file limitations in Erling, then, then that would be the end of the inquiry, at least with respect to whether there was a direct connection shown through Nakajima. I think that's, I think, I think that's correct. I think we don't dispute that. Just strictly that the commands are directly transmitted from a TV to a, to an auxiliary device is disclosed by Nakajima. Yes. Thank you.